**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JACOB WALLACE,

Plaintiff,

v. Case No.: 3:25-cv-630-WWB-SJH

ENERGY TRANSFER INTERSTATE HOLDINGS, LLC, ENERGY TRANSFER EMPLOYEE MANAGEMENT, LLC and FLORIDA GAS TRANSMISSION COMPANY LLC,

Defendants.
_______________________________/

**ORDER**

THIS CAUSE is before the Court on Defendants' Motion for Summary Judgment (Doc. 27), Plaintiff's Response (Doc. 29), and Defendant's Reply (Doc. 30). For the reasons set forth below, Defendants' Motion will be granted in part and denied in part.

## I. BACKGROUND

Defendants own and operate approximately 140,000 miles of pipelines for the transportation, storage, and terminaling of natural gas, crude oil, and natural gas liquids across the United States. (Doc. 27-1 at 3). Plaintiff, Jacob Wallace, began working on the pipeline in the Brooker, Florida facility on October 5, 1965, and was employed, as relevant to this case, as a pipeline technician. (*Id.*; Doc. 27-3 at 6–8).

In 2012, Benjamin Myers was promoted to the role of pipeline technician. (Doc. 27-3 at 7–8, 15–16). Plaintiff helped train Myers with respect to the various responsibilities of the role, including making job plans. (Doc. 29-1 at 8, 27). Upon Myers's promotion, their then-supervisor informed Plaintiff and Myers how they would be expected

to divide the responsibilities of the position and told Plaintiff that Myers would act as the "lead" on projects while Plaintiff would be responsible for construction watches and other aspects of the job. (Doc. 27-3 at 39–40; Doc. 29-1 at 5–6). In 2017, Will Andrews became Plaintiff's supervisor. (Doc. 27-3 at 9). Plaintiff states that Andrews was aware of the way in which the duties and responsibilities had been divided and did not change that division when he became Plaintiff's supervisor. (Doc. 29-1 at 8). From 2017 to 2022, Andrews gave Plaintiff positive performance reviews and did not discipline or reprimand Plaintiff. (Doc. 27-3 at 14–15; Doc. 29-1 at 4).

At some point in 2023, Andrews expressed concerns to his supervisor, Director of Operations Cody Arnold, that Plaintiff was relying too heavily on Myers to perform Plaintiff's duties. (Doc. 27-5 at 3). Andrews states this was based on his personal observations as well as discussions with Myers regarding the division of work. (Doc. 27-6 at 4–5; Doc. 29-2 at 9–10; *see also* Doc. 27-7 at 4). Beginning in late 2023, Andrews, Arnold, Vice President David Shellhouse, and representatives from human resources began discussing complaints regarding Plaintiff's job performance, specifically that he was overly reliant on coworkers to complete certain tasks, failed to independently complete all the responsibilities associated with his position, and submitted incomplete work product. (Doc. 27-4 at 3–4, 21–22). Arnold spoke with Myers regarding their concerns. (Doc. 27-5 at 3; Doc. 27-8 at 34–35). Additionally, during this time frame, Arnold was informed that Phillip Fisher, a manager in the construction group, was concerned when he found out that Plaintiff had been assigned to complete the lockout/tagout on one his projects. (Doc. 27-8 at 6–7). Fisher expressed concerns that Plaintiff would not complete the work accurately and efficiently. (*Id.* at 7). Arnold

interpreted Fisher's statements as a concern for the safety of his team and a request that someone else either be assigned to complete the work or that Plaintiff's work be double checked. (*Id.* at 8).

While these discussions were occurring, Andrews states that throughout 2023, he had multiple conversations with Plaintiff regarding performance expectations and the need for pipeline technicians to independently perform all the responsibilities associated with the position. (Doc. 27-6 at 4). Plaintiff, however, denies that any such conversations took place. (Doc. 29-1 at 10–11, 26).

In addition to concerns regarding the division of work, Defendants also noted a handful of issues with Plaintiff's performance. First, in October 2023, Andrews asked Plaintiff to investigate an unapproved crossing by a timber company. (Doc. 27-6 at 5). Plaintiff went to the location, did not observe any unauthorized crossings and was informed by personnel there that no further crossings would occur. (Doc. 29-1 at 6–7, 27; Doc. 29-4 at 18–19, 21). As a result, Plaintiff did not take any further action aside from informing them they would need authorization if they wanted to cross the pipeline again. (Doc. 29-1 at 27; Doc. 29-4 at 24–25). Defendants state that Plaintiff only spent roughly five minutes at the site, while Plaintiff estimated he spent thirty to forty minutes at the site. (Doc. 29-4 at 18; Doc. 29-9 at 64–65). A few weeks later, Myers discovered that additional unapproved crossings were still occurring at the location and took corrective measures. (Doc. 27-6 at 5; Doc. 27-7 at 7–10). In November 2023, Plaintiff missed an e-mail regarding a meeting and failed to attend the meeting. (Doc. 27-6 at 5–6; Doc. 29-1 at 27). Finally, in January 2024, Plaintiff failed to mark one of two pipes located in an area near Defendants' right of way, where a farmer was attempting to dig. (Doc. 27-5 at 4;

Doc. 27-6 at 7; Doc. 27-7 at 6–7). Although Plaintiff admits he did not mark the second pipe, he states he did not do so because the farmer had only a shovel and would not have been able to reach or damage that pipe. (Doc. 29-1 at 29).

In December 2023, to confirm that Plaintiff was completing all the required activities of the pipeline technician position and to reduce work assigned to Myers, Defendants decided to divide the duties of the two pipeline technicians by geographic regions. (Doc. 27-6 at 6–7). Although Plaintiff was aware of this change, he states that it did not go into effect prior to his removal due to projects that Myers was working on at the time. (Doc. 29-1 at 11–12; Doc. 29-4 at 29–31). Around the same time, Plaintiff informed Andrews that he needed help to complete a job plan for an upcoming project. (Doc. 27-6 at 7; Doc. 29-4 at 30–31). Plaintiff states that due to the prior division of responsibilities, he had not completed such a plan in over ten years and was unfamiliar with changes to the requirements during that time, which Plaintiff states Andrews knew. (Doc. 29-1 at 8–9). As a result, he asked for help with the plan. (Doc. 29-4 at 30–31). Andrews stated that he would assist Plaintiff in completing the assignment, but when Plaintiff followed up Andrews told him that he would "take care of it." (*Id.*). Shellhouse testified that completing such plans "is a pretty basic activity for a pipeline tech" and that he would expect Plaintiff to be able to complete one "as a routine part of his job," and to be teaching younger techs how to do so as well. (Doc. 27-9 at 6–8). Myers ultimately completed the plan. (Doc. 27-7 at 13–14; Doc. 29-1 at 12). Andrews also testified that in February 2024 he asked Plaintiff to take lead on a project involving the isolation of a pipeline segment and Plaintiff stated that he would not be able to do so. (Doc. 27-6 at 7–8). Plaintiff denies this in its entirety. (Doc. 29-1 at 29).

Pursuant to the discussions between Andrews, Arnold, Shellhouse, and human resources, Arnold requested that Plaintiff be placed on a performance improvement plan ("**PIP**"). (Doc. 27-5 at 5). Shellhouse asked if any alternative options could also be made available to provide Plaintiff "a more graceful way . . . to retire with his dignity without going through the whole disciplinary process." (Doc. 29-3 at 9). Ultimately it was determined that Plaintiff would be offered the option to either be placed on a PIP while continuing his employment or to sign a voluntary separation agreement in exchange for a $30,000 payout. (Doc. 27-1 at 5; Doc. 27-4 at 4–5; Doc. 27-5 at 6). As a result, on February 23, 2024, Plaintiff met offsite with Andrews, Arnold, and a representative from human resources. (Doc. 27-3 at 44–45; Doc. 27-5 at 5–6). During the meeting, Plaintiff was presented with the written separation agreement, which stated that his termination would be effective March 1, 2024, and also informed of his option to be placed on a PIP. (Doc. 27-3 at 46; Doc. 29-1 at 15; Doc. 29-6 at 24). The PIP had not been drafted at the time of the meeting and no written plan was presented to Plaintiff. (Doc. 27-3 at 48; Doc. 27-4 at 6; Doc. 29-1 at 15–16; Doc. 29-3 at 19–20). Arnold told Plaintiff to think it over and give him an answer by the following Monday. (Doc. 27-2 at 14; Doc. 27-4 at 6–7; Doc. 27-5 at 7; Doc. 27-8 at 29).

On Monday, February 26, 2024, Arnold went to Plaintiff's office to discuss Plaintiff's decision. (Doc. 27-8 at 20–21; Doc. 29-1 at 16). Plaintiff testified that he asked Arnold if he would be terminated anyway even if he completed the PIP and Arnold told him that it was a "good possibility." (Doc. 27-3 at 47; Doc. 29-1 at 18). Plaintiff did not state that he wished to be placed on a PIP at this meeting, but also did not state that he would sign the separation agreement. (Doc. 27-3 at 49, 53). However, because Arnold was under the

impression that Plaintiff was electing the separation, he told Plaintiff to go home that day, that he would not need to report to work for the remainder of the week, and that his last day would officially be March 1, 2024. (Doc. 29-3 at 17–18; Doc. 29-5 at 12).

Two days later, Plaintiff contacted human resources and informed them that he was not resigning or taking the separation agreement. (Doc. 29-1 at 18–19; Doc. 29-5 at 27). When Plaintiff did not, thereafter, return the signed agreement by March 1, 2024, Defendants contacted him to discuss his decision and told him that he could return the agreement or return to work on March 4, 2024. (Doc. 27-4 at 7; Doc. 27-5 at 8; Doc. 29-1 at 18–19). On March 4, 2024, Plaintiff returned the signed agreement to Defendants. (Doc. 27-3 at 55; Doc. 29-9 at 31). The agreement provided that Plaintiff had seven days to revoke his decision. (Doc. 29-9 at 28). On March 8, 2024, Plaintiff sent a letter to Defendant revoking the separation agreement. (Doc. 27-3 at 99–100; Doc. 29-9 at 25). Plaintiff did not request a PIP in his revocation letter and did not return to work after submitting his revocation. (Doc. 27-4 at 7; Doc. 27-5 at 9). Defendants were informed not to contact Plaintiff. (Doc. 27-5 at 9).

In his revocation letter and in the February 26, 2024 meeting with Arnold, Plaintiff voiced his belief that he was being discriminated against because of his age. (Doc. 27-3 at 58–59, 99–100; Doc. 27-5 at 8; Doc. 27-8 at 50, 52). In support of this, Plaintiff points to a number of incidents involving Andrews in the 2023-to-2024-time frame. Specifically, Plaintiff testified that in 2022 Andrews began limiting his access to overtime hours and, on at least one occasion, sent Plaintiff home to “get his rest,” despite allowing other individuals to continue working through the night. (Doc. 27-3 at 73, 75–76; Doc. 29-1 at 21–22). On another occasion Andrews told Plaintiff that he did not want him working in

the engine room with the contractors because he was "too old," and Andrews was afraid Plaintiff would get injured. (Doc. 27-3 at 63–65; Doc. 29-1 at 21). On other occasions, Plaintiff testified that Andrews told Plaintiff that he would not be able to beat the record as the longest serving employee because Plaintiff was too old and would not be there in another year or two. (Doc. 27-3 at 66–67). Andrews also introduced Plaintiff as "Grandpa" to a new employee in front of several other employees. (*Id.* at 68–69; Doc. 29-1 at 21; Doc. 29-2 at 68, 71). When Plaintiff corrected Andrews, Plaintiff testified that Andrews again referred to him as "Grandpa." (Doc. 27-3 at 69). Andrews denies that he called Plaintiff grandpa, stating that Plaintiff simply misunderstood him, but three other employees that were present have submitted sworn statements corroborating Plaintiff's version of the events. (Doc. 27-5 at 8; Doc. 29-2 at 41, 67–71; Doc. 29-5 at 17; Doc. 29-8 at 13–14).

In May 2024, Plaintiff filed a charge of age discrimination with the Florida Commission on Human Relations. (Doc. 27-3 at 86–87). The Commission made a determination of reasonable cause. (Doc. 29-9 at 115–121). Thereafter, Plaintiff filed this lawsuit alleging age discrimination in violation of the Florida Civil Rights Act ("**FCRA**"), Fla. Stat. § 760.01 *et seq.*, and the Age Discrimination in Employment Act ("**ADEA**"), 28 U.S.C. § 621 *et seq.* (*See generally* Doc. 3).

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

## III. DISCUSSION

Plaintiff alleges that Defendants unlawfully discriminated against him on the basis of his age in violation of the ADEA and the FCRA. "The ADEA prohibits employers from firing employees who are forty years or older because of their age." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015). The FCRA similarly prohibits the discharge of an employee based on age. Fla. Stat. § 760.10(1)(a). "Age discrimination

claims brought under the FCRA are analyzed under the same framework as the [ADEA]." *Rainey v. United Parcel Serv., Inc.*, 816 F. App'x 397, 400 (11th Cir. 2020).

First, Defendants argue that neither Energy Transfer Employee Management, LLC ("**ETEM**") nor Florida Gas Transmission Company LLC ("**Florida Gas**") were Plaintiff's employers, and they are, therefore, entitled to summary judgment on Plaintiff's claims. With respect to ETEM, Defendants offer the Declaration of David Shellhouse, which states that, to his knowledge, "Energy Transfer Employment Management *Company* did not employ [Plaintiff]." (Doc. 27-1 at 3 (emphasis added)). Even assuming that Shellhouse was intending to refer to ETEM, and not a similarly named company, Plaintiff has presented evidence that he was issued a W-2 containing an employer identification number associated with ETEM. (Doc. 29-1 at 32–33). This is sufficient evidence from which a reasonable jury could find that ETEM was Plaintiff's employer. Turning to Florida Gas, Shellhouse states that "it does not employ the operational personnel who support pipeline operations." (Doc. 27-1 at 3). While Plaintiff points out that Andrews's e-mail signature lists him as the operations manager at "Florida Gas Transmission Company," this fails to offer evidence that Plaintiff was employed by Florida Gas. Because the undisputed record evidence states that Florida Gas did not employ Plaintiff and Plaintiff has offered no evidence from which a reasonable jury could determine that it did, the Court will grant summary judgment as to all claims against Florida Gas.

Next, Defendants argue that Plaintiffs claims fail under either the *McDonnell Douglas*[1] burden-shifting framework or the convincing mosaic theory. Under the *McDonnell Douglas* standard, the plaintiff has the initial burden to establish a prima facie

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. "To establish a prima facie case of age discrimination under *McDonnell Douglas*, a plaintiff must show he (1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual." *Lapikas v. Mariner Sands Country Club, Inc.*, No. 25-12417, 2026 WL 2690108, at *4 (11th Cir. Sept. 14, 2026) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000)). "To establish a claim under the ADEA, 'a plaintiff must prove that age was the "but-for" cause of the employer's adverse decision.'" *McCreight v. AuburnBank*, 117 F.4th 1322, 1334 (11th Cir. 2024) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

"If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis v. City of Union City*, 918 F.3d 1213, 1221 (11th Cir. 2019). "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination . . . ." *Id.*; *see also Chriswell v. Americold Acquisitions*, No. 25-11070, 2025 WL 3677563, at *3 (11th Cir. Dec. 18, 2025). The plaintiff is required to rebut each legitimate, non-retaliatory or nondiscriminatory reason given by the defendant. *Crawford v. City of Fairburn*, 482 F.3d 1305, 1309 (11th Cir. 2007).

To the extent the plaintiff is unable to make a prima facie showing under the *McDonnell Douglas* standard, the court must still consider if the record creates a convincing mosaic sufficient to permit the plaintiff's claims to proceed to trial under Rule 56. *Ismael v. Roundtree*, 161 F.4th 752, 764–65 (11th Cir. 2025). Thus, even if the plaintiff

cannot satisfy the *McDonnell Douglas* framework, his claims will survive summary judgment when he has "introduced a variety of evidence which, as a whole, strongly suggested that the [ ] employment decisions were based on h[is age]." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1337 (11th Cir. 2024). "That entire evidentiary picture may include, among other things, (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023) (quotation omitted).

Defendants argue that Plaintiff fails to establish a prima facie case because (1) he suffered no adverse employment action and (2) he was not qualified. With respect to the latter, Defendants' argument consists of two sentences in their introductory section without citation to case law or further explanation of precisely how Plaintiff was not qualified for his position. (Doc. 27 at 16). The Court need not consider such perfunctory and underdeveloped arguments. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (noting that the court need not consider "perfunctory and underdeveloped" arguments and that such arguments are waived); *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

To establish an adverse employment action, the plaintiff must show "some 'disadvantageous' change in an employment term or condition"; in other words, the plaintiff "must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024). The plaintiff need not, however, show "that the harm incurred was significant[,] . . . serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 355 (quotation omitted); *see also Ward v. Dep't of*

*the Navy*, No. 6:23-cv-1387, 2025 WL 1677499, at *5 n.5 (M.D. Fla. June 13, 2025) ("Though *Muldrow* involved a Title VII discrimination claim, its reasoning, rooted in the language of Title VII, would appear to apply equally to an age discrimination claim under the ADEA.").

Defendants argue that Plaintiff voluntarily resigned in lieu of being placed on a PIP and, therefore, he did not suffer an adverse employment action. In response, Plaintiff argues that there is at least sufficient evidence from which a jury could determine that Plaintiff was actually terminated. In support of his argument, Plaintiff cites *Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432 (11th Cir. 1997). In *Thomas*, the Eleventh Circuit held that a reasonable jury could have determined that the plaintiff was terminated from her position as an area sales manager when she was called into a meeting and told she could "no longer be an Area Sales Manager in this store," despite the fact that there was evidence that her supervisor also offered her an alternative position as a sales associate in that store or another store after the plaintiff became distraught. *Id.* at 1436–37. In doing so, the Eleventh Circuit emphasized that "[t]he proper legal standard [to determine if a termination occurred] requires analysis of the employer's intent, which may be inferred not only from words but also from conduct, as well as the specific circumstances of the challenged job action." *Id.* at 1437; *see also id.* at 1434 ("The case law makes clear that the inquiry as to whether actual termination has occurred involves analysis of the employer's intent.").

In this case, although Plaintiff was offered a PIP as an alternative to the separation agreement, the facts and circumstances surrounding the offer and subsequent termination make it unclear that Defendants did not intend to terminate Plaintiff. As an

initial matter, although Arnold only initially requested a PIP for Plaintiff, Shellhouse requested the alternative separation agreement to be offered to provide Plaintiff "a more graceful way . . . to retire with his dignity without going through the whole disciplinary process." (Doc. 29-3 at 9). A reasonable jury could infer that this was evidence that Defendants intended to terminate Plaintiff, or force his retirement, regardless of the outcome of any disciplinary process that was nominally offered. Additionally, everyone concedes that no formal PIP was presented to Plaintiff at the meeting and, in fact, no such plan had been developed by the time of the meeting or by the following Monday when they requested Plaintiff's decision. When Plaintiff spoke to Arnold on that Monday, Arnold told Plaintiff there was a good chance that Plaintiff would not be successful in completing the PIP—which Arnold admittedly could not have reviewed because it did not yet exist. Additionally, Arnold told Plaintiff to go home and not to be in the field for the remainder of the week and that Plaintiff's last day would be Friday, despite the fact that Plaintiff had not formally accepted the separation agreement or declined a PIP.

On that Wednesday, Plaintiff informed human resources that he was not resigning or accepting the separation package. (Doc. 29-5 at 27). Nevertheless, Plaintiff was not immediately asked to return to work. Instead, Plaintiff was contacted two days later, on March 1, 2024, and given until March 4, 2024, to sign the separation agreement or return to work under a PIP.[2] (Doc. 27-5 at 8; Doc. 29-1 at 18–19). Plaintiff signed the separation agreement and returned it on March 4, 2024, but timely revoked it on March 8, 2024.

[2] Although Plaintiff states that Arnold and Cervantes "did not change or revoke the time of my termination having been set for March 1, 2024," (Doc. 29-1 at 19), Plaintiff does not dispute that he was told that he could return to work on March 4, 2024, under a PIP.

Despite this, there is no evidence or testimony that Defendants contacted Plaintiff to return to work. In fact, the evidence shows that Plaintiff's supervisors were explicitly told not to contact Plaintiff. Considering the record as a whole, and taking all reasonable inferences in favor of Plaintiff, a reasonable jury could determine that Defendants "use[d] language or engage[d] in conduct that would logically lead a prudent person to believe his tenure has been terminated." *Thomas*, 116 F.3d at 1434 (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 88 (2d Cir. 1996)); *see also Chavez-Deremer v. Avenger Prods., LLC*, No. 2:24-cv-31, 2025 WL 5266734, at *11–12 (N.D. Ga. Oct. 27, 2025).

Having determined that Plaintiff made a prima facie showing of discrimination,[3] the burden shifts to Defendants to show that it had legitimate, non-discriminatory reasons for its actions. Defendants' burden to do so is "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). "The employer need not persuade, but need only 'produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" *James v. Gen. Mills Operations, LLC*, 810 F. Supp. 3d 1307, 1343 (N.D. Ga. 2025) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981)). Defendants have met their burden in this case. Specifically, Defendants have produced evidence that Andrews became aware in late 2023 that Plaintiff was shifting certain job responsibilities to Myers and, as a result, Myers felt the balance of workload needed to be redistributed; that Plaintiff failed to adequately respond to an unapproved crossing, resulting in additional work for Myers and potential damage to the pipeline; that Arnold

[3] Defendants do not challenge the first or fourth prongs and, therefore, the Court will not address those elements of the prima facie case at this juncture.

was informed by another employee that he had concerns working with Plaintiff regarding the proper following of procedures and completeness of work; that Plaintiff failed to properly mark pipeline locations on at least one occasion; that Plaintiff missed an important meeting; and that Plaintiff stated that he would be unable to complete a job without assistance because he had not completed one in roughly ten years and refused to take lead on the associated project. *See Perkins v. Callrail, Inc.*, No. 1:24-cv-2551, 2026 WL 1459188, at *14 (N.D. Ga. Jan. 27, 2026), *adopted* 2026 WL 1459183 (N.D. Ga. Mar. 30, 2026); *Faucette v. Nat'l Hockey League*, No. 8:04CV2185T, 2006 WL 213857, at *7 (M.D. Fla. Jan. 27, 2006).

Although Plaintiff disputes the factual basis for many of Defendants' proffered reasons, he does not directly argue that the evidence supports a finding of pretext under the final step of the *McDonnell Douglas* framework. Instead, Plaintiff relies primarily on a convincing mosaic argument. Accordingly, the Court will dispense with the final step of the *McDonnell Douglas* analysis and move to the convincing mosaic. In this regard, Plaintiff argues that the following evidence makes a sufficient showing of pretext to permit his claim to proceed to the jury: (1) the lack of negative performance reviews or disciplinary action prior to late 2023; (2) the minor nature of alleged performance issues; (3) Defendants' failure to follow their progressive discipline policies; (4) the division of labor that was established by Defendants in 2012 and known to Defendants prior to 2023; (5) comments and actions taken by Andrews including referring to Plaintiff as grandpa and stating that Plaintiff was too old to perform certain work activities; (6) evidence that Andrews has lied about age-related comments made to Plaintiff; (7) findings of probable cause by both the Florida Commission on Human Relations and the Equal Employment

Opportunity Commission; (8) differential treatment of younger employees; (9) that Plaintiff earned a performance based bonus for 2022; (10) that Plaintiff's duties were reassigned to younger employees and he was ultimately replaced by a much younger employee; and (11) Defendants' failure to permit Plaintiff twenty-one days to review and consider his options as set forth in the separation agreement.

In response, Defendants argue that any evidence that Andrews made aged-based comments to Plaintiff cannot support a finding of pretext because there is no evidence that Arnold and Shellhouse—the decisionmakers in this case—harbored discriminatory intent and Arnold conducted an independent investigation in the claims made by Andrews. Defendants also argue that Plaintiff cannot rely on a determination by the Florida Commission on Human Relations to create a convincing mosaic or triable issue of fact. Defendants do not otherwise address Plaintiff's arguments.

There is no question that a reasonable jury could find that Andrews was biased against Plaintiff based on his age. There is evidence that Andrews introduced Plaintiff as grandpa in front of multiple people—who have corroborated the story under penalty of perjury—but subsequently attempted to deny that he did so. Plaintiff has also offered evidence that Andrews told Plaintiff that he was too old to perform certain tasks, needed to "get his rest," despite allowing younger employees to continue working, and, perhaps most tellingly, told Plaintiff that Plaintiff would not be employed by Defendants long enough to achieve his goal of being the longest serving employee because Plaintiff was too old. Nevertheless, Andrews was not the decisionmaker in this case and there is evidence that at least Arnold, who ultimately recommended placing Plaintiff on a PIP, conducted an independent investigation regarding Plaintiff's performance. Accordingly,

as Defendants argue, the statements made by Andrews alone cannot create a triable issue of fact.

Plaintiff, however, does not rely on Andrews's statements alone to support his argument. First, as Plaintiff points out, Arnold's independent investigation appears to have largely been limited to a conversation with Myers regarding the distribution of work. But there is also undisputed evidence in the record that Plaintiff and Myers were acting in accordance with the allocation of duties made by their former supervisor in 2012. Defendants do not dispute that Andrews and the other decisionmakers were aware of the structure that was created in 2012, and Defendants have not directed the Court to any evidence that Plaintiff was not at least attempting to complete the duties assigned to him under that division of responsibilities. Furthermore, in his 2022 performance review, Plaintiff received a rating of "Meets expectations" for collaboration and teamwork and the notes only indicate that he needed to be more patient with other departments, not that he was failing to carry his share of the workload. (Doc. 27-6 at 12–13). Simply put, there is no evidence in the record that Plaintiff was not fully performing his job in accordance with the expectations communicated to him in 2012. To the extent Plaintiff's workload was lighter than Myers's workload, there is also no evidence in the record that this was because Plaintiff was improperly attempting to shift his work onto Myers.

Next, as Plaintiff points out, there is testimony that the alleged performance failures—regarding the crossing, the marking of the pipeline, and the missed e-mail—were of a minor nature that would not typically result in discipline. (Doc. 27-8 at 9; Doc. 29-2 at 32–33). Plaintiff also states that he was never counseled regarding these

incidents or given an opportunity to provide his statement regarding the events.[4] (Doc. 29-1 at 10–11, 22–24, 26). With respect to the refusal to take lead on a project after his duties were restructured, Plaintiff provided evidence that he asked for assistance to complete the task because he had not done it in over ten years in accordance with the division of responsibilities set forth by Defendants. Nevertheless, Andrews denied him help from Myers and also declined to mentor him through the process, instead telling him not to worry about it. There is no evidence that Arnold or Shellhouse independently investigated Andrews's allegations that Plaintiff simply refused to do the work or was incapable of doing the work.

Additionally, despite having a progressive discipline policy, Defendants declined to utilize it in this instance, although there were relatively few infractions, and they were minor in nature. There is also evidence that Andrews gave lower ratings to other younger employees and gave them negative performance ratings—including a perceived lack of motivation and contribution—but there is no evidence that any of them were terminated, place on PIPs, or otherwise disciplined. (Doc. 29-2 at 54–58, 72; Doc. 29-5 at 10–11; Doc. 29-9 at 92). There is also no evidence that other employees were ever given an option between termination and placement on a PIP. In fact, although Arnold only initially sought a PIP, Shellhouse—who does not appear to have conducted any independent investigation—asked if Plaintiff could be offered the alternative separation agreement in recognition of his years of service and to allow Plaintiff "a more graceful way" out. (Doc. 29-3 at 9, 15; *see also* Doc. 27-8 at 12). Taken as a whole, the Court finds that the record

[4] Although this is disputed, the Court takes the facts in the light most favorable to Plaintiff and does not weigh the credibility of the testimony.

presents sufficient evidence to of discrimination to defeat summary judgment. Therefore, Defendants' Motion will be denied.

## IV. CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** that Defendants' Motion for Summary Judgment (Doc. 27) is **GRANTED in part** as to all claims against Defendant Florida Gas Transmission Company LLC and **DENIED** in all other respects.

**DONE AND ORDERED** in Jacksonville, Florida on November 2, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record